Howell and Gibson v. Sewing Machine Co.

SAMUEL J. HOWELL AND THOMAS GIBSON, PLAINTIFFS IN
ERROR, v. THE WILCOX & GIBBS SEWING MACHINE
CO., DEFENDANT IN ERROR.

12  177
48  429

1. Partnership Name: USE OF. One member of a partnership
has no right to give a promissory note in settlement of his in-
dividual debt, unless duly authorized by his co-partner, or it is
afterwards ratified by him.
2. ———. Evidence reviewed and held to be inadequate to
prove either assent or ratification.
3. Instructions to Jury. When, in consequence of a mis-state-
ment of the pleadings, an instruction has a tendency to confuse
or mislead the jury, it is good ground for a new trial.

ERROR to the district court for Douglas county. Tried
below, before SAVAGE, J. The facts appear in the opin-
ion.

*Kennedy & Gilbert,* for plaintiffs in error, cited, *Lansing
v. Gaine,* 2 Johns., 300. *Foot v. Sabin,* 19 Johns., 154.
*Whitaker v. Brown,* 11 Wend., 75. *Tallmadge v. Penoyer,*
35 Barb., 120. *Livingston v. Hastie,* 2 Caines, 246.
*Dubois v. Rosevelt,* 4 Johns., 262. *Williams v. Walbridge,*
3 Wend., 415. *Joice v. Williams,* 14 Wend., 141. *Elliott
v. Dudley,* 19 Barb., 326.

*C. J. Green,* for defendant in error.

LAKE, J.

In November, 1876, Howell, one of the plaintiffs in
error, in his individual capacity, and for himself alone,
entered into an arrangement with the defendant in error
to canvass for the sale, and sell its sewing machines in
this state, and in the territories of Wyoming and Utah.
For a number of the machines, [and other property,
received by him from the company in pursuance of this
arrangement, Howell incurred the indebtedness for
which the notes in controversy were finally given, in sat-
isfaction of his individual notes which had matured.

12

Shortly after Howell had made this arrangement, and incurred the indebtedness, he entered into negotiations with his co-plaintiff in error, which 'resulted in their becoming associated under the firm name of S. J. Howell & Co., for the prosecution of that portion of the business relating to Wyoming and Utah; Howell's relation to the sewing machine company remaining unchanged, and he retaining that branch of the business to be done in Nebraska to himself.    Thus far the facts are conceded, or abundantly proved, and there is really no controversy between the parties respecting them.

And it is also established by undisputed evidence, that, owing to the failure of Howell to obtain from the sewing machine company the requisite number of machines to enable Gibson, who was to take personal charge of the business in Wyoming and Utah, to prosecute the work with vigor as he had arranged, not a single machine was sold in either of those territories, and nothing beyond mere preparation, by way of correspondence and distribution of printed circulars, was done toward carrying out the scheme for which the firm of S. J. Howell & Co. was formed.

The first error assigned, and the one most relied on is, that the verdict of the jury is not sustained by sufficient evidence, and its consideration will require a brief examination of the pleadings, and the testimony bearing upon the issues thereby formed.

We find that the notes on which the action was brought were executed in the name of S. J. Howell & Co.    The action is against Howell and Gibson in their individual capacities.    As before shown, they were given in renewal of the individual notes of Howell alone, and for an indebtedness to which Gibson was not, originally at least, a party.    In his separate answer, Gibson, after reciting the before mentioned arrangement between the sewing machine company and Howell, alleges that he

" never in any manner incurred, nor assumed any liability, either in respect to the purchase of said machines, or upon said promissory notes, or either of them; and never, in any manner, authorized, or consented to the execution of said promissory notes, or either of them, in the name of S. J. Howell & Co.," etc.

To this answer there is no reply, and we might dispose of the case, as to Gibson, upon the ground that, by the admitted facts, no liability is shown, but we prefer to examine this question by the light of the testimony. It being conceded that Gibson was not in any manner connected with the original transaction between Howell and the sewing machine company, it follows that he could not, without his individual assent, be rendered liable for Howell's indebtedness on that account. It is a conceded fact that these renewal notes were actually signed by Howell. Unless duly authorized by Gibson, Howell had no right to thus use the name of S. J. Howell & Co. As was well said by the district judge, in his charge to the jury: " The notes, having been given for a debt incurred prior to the formation of any connection between Messrs. Howell and Gibson, are not a valid claim against Mr. Gibson, unless he authorized the signing of the firm name, or ratified Mr. Howell's action after learning that he had so signed."

The testimony chiefly relied on to show that Gibson authorized this use of the firm name, is taht of two witnesses, Hemingway and Tallman, taken by deposition. The first of these witnesses was in the employ of the defendant in error at Omaha before and at the time Howell gave the first notes. It is quite evident from the testimony that, in giving it, she was laboring to connect Gibson with them, and to show that he regarded himself as jointly liable with Howell thereon. Her testimony is as to what transpired before the notes in dispute were given. For instance, she swears that she called upon both Howell

and Gibson for payment " on account of indebtedness to
the company for machines sold," by turning over some
of the machines then on hand, and that "Mr. Gibson
said they had already turned over all they could spare,"
that " they complained of hard times, and a general
reduction in prices. Mr. Gibson said that he thought the
company ought to help, but that if it would not, then we
can stand it ourselves." She says : " I urged payment,
and Mr. Gibson said he had no loose money by him
then.' Between them, they said they would like to
give new notes. Whether Mr. Howell or Mr. Gibson first
said this, I don't know. They were both together, and
we talked that matter over between us, and we all dis-
cussed the question of new notes to be given by them for
an extension. In speaking of giving new notes, they said
'we.' Howell did not say 'I,' nor did Gibson speak of
them as being Howell's notes alone. Mr. Gibson wanted
the company to help them by taking notes for a less
amount, that is, to deduct something from what I sup-
posed were Howell's old notes, and it was in that way
that he wanted the company to help them, and said that
if the company would not do so, we can stand it our-
selves. I would not do this, then they said they would
give new notes for an extension. They said that was the
best they could do. Mr. Howell brought me, before
I went away, no money, nor did Mr. Gibson, as they
could not raise any cash at that time. They promised
to send me money as soon as they could raise it; and I
received $55.50 from them after I got to Saint Joseph.
When I left Omaha they had given me to understand
that they would give the extension notes. Neither of
them denied the indebtedness, on the contrary spoke of
the amount as owing by them frequently."

For several reasons, the entire truthfulness of this
witness is doubtful. It is not claimed that, up to the time
of her alleged conversations with Gibson, he had in any

way become a party to Howell's indebtedness to the sewing machine company, and yet she would convey the idea that he had evinced to her as much interest in the matter as if he were a principal therein, promising payment from time to time, and actually sending her at Saint Joseph the sum of $55.50 on account of the original notes. As to Gibson, her story is not only unreasonable in view of the conceded facts, but she is flatly contradicted in important particulars by all of the other witnesses, even by Tallman, another witness of the defendant in error, who made all of the contracts, and took both the original and renewal notes. As to the small payment sent to her, as she swears, by both Howell and Gibson, Tallman says in his testimony, that "he, Howell, paid to our agent, Miss Hemingway, fifty or fifty-five dollars, according to her report," so that her report to Tallman and her testimony cannot both be true. But even if the fullest credit were to be given to all she says, its only effect as between these parties would be to show that Gibson was interesting himself in Howell's business, and was at that time merely willing to aid him in procuring an extension of time, by joining with him in renewal notes; for, that he was under any legal obligation to the sewing machine company, prior to the date of the notes in controversy, is neither claimed nor shown. Tallman, who acted for the company in making all of the contracts with Howell, and who took both the original and renewal notes, states explicitly that he had nothing to do with Gibson, and did not even know him, until the day he took the notes in controversy.

The question, whether Gibson actually became a party to the renewal notes, must be settled, mainly, as we think, by what actually occurred on the day they were given, for although he may have been willing to aid Howell by lending his credit, yet if he neither authorized Howell to use it, nor ratified its use afterwards, surely he cannot be

held liable.   Gibson not only swears positively that he did not authorize the execution of the notes in the name of S. J. Howell & Co., but that he had no knowledge even of its having been done, until after they had matured; and in this he is fully corroborated by Howell, who it is conceded actually affixed the signature to them.

Against the explicit and positive testimony of both Gibson and Howell, that such use of the partnership name was wholly unauthorized by the former, we have nothing but Tallman's recollection of the matter.   He swears that on the day the notes were given he came to Omaha "with the view of securing or collecting money due us from Samuel J. Howell," not from S. J. Howell & Co.   That he was much pressed for time, having only a "very few hours, perhaps three or four, possibly five, in which to transact business with Mr. Howell, driven twelve miles in the country and back, and then got train for St. Louis that same day."   To save time, he says, he took Mr. Howell with him on his drive to the country, and on the way talked over the matter of settlement, and arranged to take back "a portion of the stock remaining in his hands and credit the value of the same upon the past due notes then in our hands against him, we to receive about fifty dollars in money; the balance of eight hundred dollars then due to be paid by the notes of S. J. Howell & Co."   This it will be observed is stated as the result of the interview between himself and Howell alone. He swears further, that on his return to Omaha, he saw Gibson and told him of the conclusion to which he and Howell had come, and that he was willing to take back a portion of the stock, "receive about fifty dollars in money, and the balance in the notes of S. J. Howell and Thomas Gibson.   Mr. Gibson and Mr. Howell consented to the arrangement, and delivered to me four notes of S. J. Howell & Co., in settlement of the balance."   That "S. J. Howell signed for the Company," in his presence, and

in the presence of Gibson. He further says, that he took
the notes "in a good deal of haste," and that his "inter-
view with Howell and Gibson would not exceed twenty
minutes." He had seen Mr. Gibson "never before or
since."

Conceding to this witness the utmost good faith in all.
he says of this interview, it by no means proves, against
the positive denials of both Howell and Gibson, nor even
without these denials would it be satisfactory, that Gib-
son authorized the signature of S. J. Howell & Co. to
these notes. He does not claim to give the precise lan-
guage used on this occasion, and it is admitted that he
could not, but only *"the gist of it."* He says, he told Gib-
son that, for the balance, he was willing to take "the
notes of S. J. Howell and Thomas Gibson," not the notes
of S. J. Howell & Co. The proposition then, it. appears,
was to take individual notes, while those executed and
delivered by Howell, were of the firm of S. J. Howell &
Co. Then, again, as to Gibson's assent to the arrange-
ment, this is a mere conclusion of the witness; no facts
are stated from which the court or jury could safely con-
clude that such assent was given. We cannot accept the
conclusion of this witness, whose story was given without
cross-examination, the weight of evidence in the estab-
lishment of this principal ultimate fact. That Howell
gave his assent is evident, for he personally affixed the
signature of the firm, and delivered the notes; but not so
Gibson, who neither signed them, nor, so far as is shown
by probative facts, in any manner, by word or deed, au-
thorized this use of their firm name.

A careful reading of the testimony brings us to the
conclusion that an overwhelming preponderance of legit-
imate evidence supports the claim of Gibson, that he
neither authorized nor consented to such use of the name
and credit of his firm, and consequently that the verdict.
in this particular is unsupported by the evidence.

It is contended also, that the second instruction to the jury was erroneous.    By it the jury were told that: "The defendants answer, that by a certain written agreement made at the same time of the giving of the notes, of which these now in suit are the renewals, the plaintiff agreed to furnish *them* sewing machines at certain agreed prices," etc.    As to Howell's answer, this statement was substantially correct, but as to Gibson's it was not.    Separate answers were filed, and in Gibson's, the agreement referred to by the judge in this instruction is mentioned thus: that "Samuel J. Howell entered into a contract with the plaintiff, *in his own personal right and interest,* * * * whereby, and in consideration that said S. J. Howell should open and maintain a retail office and sales room for the sale of the plaintiff's sewing machines exclusively, * * * said plaintiff would furnish *to said Howell* all the machines necessary for that purpose," etc.

It is apparent that this instruction was a very serious mis-statement of Gibson's claim respecting his attitude to the original indebtedness, as given in his answer, and may have caused the jury to understand that he was in some way a party to the former contract between Howell and the sewing machine company, and, therefore, justly liable for machines furnished, in the language of the instruction, "*to them.*"    The fact that in a subsequent instruction the jury were properly told, as before shown, that the new notes were not a valid claim against Gibson "unless he authorized the signing of the firm name," etc., will not cure the defect, for if the jury were not in fact misled by the error, its tendency was to confuse and mislead them, which of itself we have held to be good ground for a new trial.    *Mutual Hail Insurance Company v. Wilde,* 8 Neb., 427.

As to the plaintiff in error, Howell, we see nothing in the record of which he can justly complain, but, the judg-

ment being joint, for the errors against Gibson it must be set aside and a new trial ordered.

REVERSED AND REMANDED.