# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

## APRIL TERM, 1909.

---

DANIEL F. BLAKE, Trustee in Bankruptcy of Estate of GEORGE Y. SALMON and HARVEY W. SALMON, Partners Under Firm Name of SALMON & SALMON, Appellant, v. THIRD NATIONAL BANK OF ST. LOUIS.

**In Banc, May 1, 1909.**

1. **PARTNERSHIP: Use of Firm's Money By One Partner.** One partner, without the knowledge and consent of another, cannot use the partnership property to discharge his own personal obligation; and if he does so use it, the party receiving such property, whether money or other assets of the firm, is liable to the partnership.

2. ————: ————: **Knowledge of Creditor.** And it is immaterial whether the person receiving the partnership funds in payment of the individual debt of a member of the firm knew or did not know that the partnership property was being used or was to be used to pay the individual debt of one of the partners without the consent of the others. The use of the partnership funds to pay the individual debts or obligations of a member of the firm, without the consent of the other partners, is a misappropriation of those funds, and beyond the scope of authority of one member of the firm. But in this case the evi-

(644)

dence shows that the bank receiving the partnership money knew it was being used to pay the individual obligation of a partner. [Distinguishing Goddard-Peck Grocery Co. v. McCune, 122 Mo. l. c. 431.]

3. ————: ————: **Banking Partnership: Power of Cashier.** So that where the note of a cattle firm was made payable to one partner of a partnership bank and by him, without the knowledge or consent of the other partner, indorsed to defendant bank, and subsequently the cashier of the partnership bank, with the knowledge and consent of the indorser, but without the knowledge or consent of the other partner, gave a new note signed by the banking firm, the banking firm was not liable for the payment of either note. And if the banking firm paid the last note without the knowledge or consent of the other partner, the trustee in bankruptcy of the estate of the banking firm, appointed upon its failure to represent its creditors, can recover from the defendant bank the amount (principal and interest) so paid.

4. ————: ————: ————: **Collateral Agreement: Made By Cashier: Knowledge.** A note of a cattle firm was made payable to a member of a partnership bank and that partner alone indorsed it "demand, protest and notice waived," and on the same day it was turned over to defendant bank by the cashier of the partnership bank with a letter stating that it was "the demand note" of the cattle company "indorsed by" the individual partner of the banking firm, and asking defendant "to please handle" said note and "pass the amount to our credit," and stating that the cattle company "are drawing on us for more money than we can carry them for, and hence we ask that you will please handle this note as a special favor for us," and that "if you will kindly handle same for us we hereby guarantee that during the time you carry it our credit balance with you will not fall below" the amount of the note, "and if it should fall below you are at liberty to charge our account with this note, and this letter will be your authority for doing so." The letter was signed with the name of the banking firm by the cashier, and the proceeds of the note were placed by defendant to the credit of the banking firm, and by that firm placed to the credit of the cattle firm, and each month defendant charged the banking firm with the interest on the note, and up to the failure of the cattle firm the banking firm collected the interest from it. *Held*, first, that on the face of the note the liability was on the cattle company and the individual partner of the banking firm who indorsed it, and the letter clearly indicates that the banking firm had not bought the note and was not placing it with defendant as their own, and the suggestion in the letter to pass the proceeds to the credit of the account of the banking firm with defendant was only one of the several

modern methods of transferring the proceeds to the cattle company, which was done. *Held*, second, that the cashier of the banking firm had no authority to make the guaranty he undertook to make in the letter, because it was beyond the scope of his authority to bind the banking firm to pay either the liability of the cattle company or the individual liability of the indorser of their note—the partner of the banking firm. *Held*, third, the defendant bank, having received from the banking firm the amount of the note, is liable therefor, in a suit by the trustee in bankruptcy of the estate of the defunct banking firm.

5. ————: ————: ————: ————: **Fraud.**    After the cattle company was insolvent and was dissolved by the death of one of its partners, the representative of the defendant bank, which held the note of the cattle company, indorsed by one partner of the banking firm, obtained from the banking firm its note for the amount of the cattle company note, there being no further consideration therefor, and without the knowledge of the other partner of the banking firm, the only persons having knowledge being the indorsing partner and the cashier. *Held*, that the conduct of the defendant bank in obtaining the note with the knowledge revealed by the letter that the original note had never been an obligation of the banking firm, was such as to work a fraud upon the banking firm and its creditors, and defendant is liable to the trustee in bankruptcy of such firm, for the amount of money it received from said firm on said note.

6. ————: ————: **Admitted Liability.**    The banking firm, when payment of a note indorsed by one partner is demanded of it, does not admit its liability by giving a new note signed with the firm name by the same partner, or by the bank's cashier, without the knowledge of the other partner.

7. ————: ————: **Powers of Cashier.**    The cashier and manager of a bank owned by a partnership has no greater powers than either partner. Neither he, nor one partner, nor both acting together, can, without the knowledge or consent of the other partner, obligate the banking firm to pay the individual debt of the said one partner.

8. ————: ————: ————: **Ratification.**    Nor can the one partner, nor the cashier, nor both together, after the one partner has indorsed the note of a cattle company, which was discounted by the defendant bank, subsequently in the name of the banking firm ratify the indorsement of the one partner by issuing a new note in the name of the firm. They can not ratify what they originally could not have legally done.

9. ————: ————: **Payment: Recovery: Money Had and Received.** If a customer's note, made payable to one of the partners of a banking firm, and by him indorsed to defendant bank, is subsequently paid by the banking firm, by its cashier, without the knowledge or consent of the other partner, the money so paid may be recovered for the bank's creditors, for such payment was not made with a full knowledge of the facts by the other partner. And such facts are sufficient to invoke the conscience of an equity court, in an action for money had and received.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds*, Judge.

Reversed and remanded.

*I. P. Ryland, Edward C. Crow* and *Mann & Daniel* for appellant.

(1) A transfer of partnership property by one partner to pay his individual debt without the knowledge and consent of his copartner, is void and does not have the effect to pass the title of the partnership therein, and the property, or its value, can be recovered in an appropriate action. Flanagan v. Alexander, 50 Mo. 50; Ackley v. Stachlin, 56 Mo. 558; Forney v. Adams, 74 Mo. 138; Ewart v. Tootle, 50 Mo. App. 322; Rock Island Imp. Co. v. Sloan, 83 Mo. App. 438; Hagar v. Graves, 25 Mo. App. 164; Rogers v. Batchelor, 12 Pet. 221; Daniels v. Atkinson, 124 Ill. 674. (2) The application of partnership funds or money to the payment of a debt of one member of a partnership is outside of and beyond the scope of its business, and assent to such application must be shown, or subsequent ratification proved. McNair v. Platt, 46 Ill. 213. (3) The authority of the individual partner to bind the firm by the drawing and endorsing of negotiable paper extends only to the trade or business of the firm. It is equally well settled that where one partner employs the funds of the firm in payment of his individual debt, the cred-

itor knowing that fact will be deemed to act in bad faith and in fraud of the partnership, and when funds or the paper of the firm is taken in the payment of the private debt of one of the partners, the law charges the creditor with knowledge of the fraud and imposes on him the onus of repelling that presumption. Mecutchen v. Kennedy, 27 N. J. L. 226; Farwell v. St. Paul Trust Co., 22 Am. St. Rep. 747; Harrington v. Baker, 173 Mass. 488; Lanier v. McCabe (Fla.), 48 Am. Dec. 173. (4) There are no equities in this case in favor of defendant bank. The act of Casey, the manager, in attempting to pledge the firm of Salmon & Salmon to the payment of a debt which was not the debt of the firm, and the later act of G. Y. Salmon in giving the notes of the firm for this same debt, was a fraud on the partnership and as the defendant bank was informed of the true character of this transaction by the very form of it, it is an active participant in the fraud. Ealy v. Coal & Lumber Co. 123 Ga. 557; Huttig v. Gough, 81 Mo. App. 440; Meyer v. Withmar, 41 Mo. App. 397; see, also, cases cited under point 1. Defendant is therefore in no position to invoke the equitable doctrine, invoked in the court below, that where one of two innocent parties must suffer, the loss falls upon the one whose fraud or neglect made the loss possible. (5) The right of Casey as manager, and of G. Y. Salmon as one of the firm of Salmon & Salmon, to bind the firm, rests upon the same ground, that of agency. Neither of them had any authority to bind the firm, except as to matters within the legitimate scope of the firm business. The nature and extent of the agent's authority may be implied from circumstances, but the authority will be limited to matters of like nature with those acquiesced in. Alt v. Grosclose, 61 Mo. App. 409; Cummins v. Hurd, 49 Mo. App. 139; Harrison v. Railroad, 50 Mo. App. 332; Fougue v. Burgess, 71 Mo. 389. (6) That the request of Casey in his letter to "place the proceeds to our credit" was the selection of a

method of transferring the money to Clinton and not
an indication that Salmon & Salmon were the borrow-
ers, is a matter of which the courts will take judicial
notice. "Courts cannot close their eyes to the well-
known course of business in the country." The trans-
fer of money from one part of the country to another
by an exchange of credits between banks is so univer-
sal and well established that courts will take judicial
notice of it. President Bank of Kentucky v. Adams
Express Co., 93 U. S. 185; Gibson v. Stevens, 49 U. S.
384; Lanfear v. Mestier, 89 Am. Dec. 661; State v. Met-
calf (S. D.), 100 N. W. 923.

*Lyon & Swarts* for respondent.

(1)  The notes originally discounted for Salmon
& Salmon, like the subsequent notes paid by Salmon &
Salmon, were, throughout the dealings between the
parties, treated by all of them as representing liabili-
ties of Salmon & Salmon, and must be considered as
such. Kennedy v. Bank, 14 Fed. Cas. 313; Diermeyer
v. Hackman, 52 Mo. 282; Hickman v. Kunkle, 27 Mo.
401; Wilde v. Passamaquody, 3 Monroe 505; Sun
Printing Ass'n v. Moore, 183 U. S. 642.   (2)   Even
though the notes first discounted did not carry with
them a partnership obligation, yet if when their pay-
ment was demanded of the partnership by the defend-
ant, the partnership, for purposes of its own, admitted
liability thereon, there was a   valuable   consideration
for the giving of the new notes, which the partnership
ultimately paid.  Cox v. Sloan, 158 Mo. 411; Stephens
v. Spiers, 25 Mo. 386; Diermeyer v. Hackman, 52 Mo.
282; 1 Daniel on Negotiable Instruments,   sec.   185;
Rock Island Co. v. Corbin, 83 Mo. App. 438; Lincoln
National Bank v. Schoen, 56 Mo. App. 160.   (3)   The
conduct of the partnership throughout the transaction,
as well as the receipt and retention by the partnership
of the various collateral surrendered by the defendant.

to the partnership upon the payment of the notes, binds the partnership as effectually as the most formal authorization in advance or the most formal ratification afterwards. Broughton Bros. v. Sumner, 80 Mo. App. 386; Noble v. Metcalf, 20 Mo. App. 360; Hayner v. Crow, 79 Mo. 293. (4) The moneys were paid voluntarily by Salmon & Salmon with a full knowledge of the facts, and cannot be recovered by their trustee. Welday v. Jones, 79 Mo. 170; Wolfe v. Marshal, 52 Mo. 167; Morley v. Carlson. 27 Mo. App. 5; State v. Stonestreet, 92 Mo. App. 214; Union Savings Ass'n v. Kehlor, 7 Mo. App. 158. (5) This is an action for money had and received, and the plaintiff has made no showing to entitle him to recover moneys which in equity and good conscience the defendant should return. 2 Greenleaf on Evidence (16 Ed.), sec. 117; Clifford Banking Co. v. Commission Co., 195 Mo. 262; Union Savings Ass'n v. Kehlor, 7 Mo. App. 158.

GRAVES, J.—For a long time prior to May 5, 1903, and on said date, there was in Clinton, Missouri, a copartnership composed of G. Y. Salmon and H. W. Salmon, engaged in the banking business as private bankers, under the firm name of Salmon & Salmon. At all the dates of the transactions involved in this suit Thomas M. Casey was the man in charge and manager of the banking business of the said Salmon & Salmon. For a long time prior to May 5, 1903, and thereafter up to October 20, 1903, there existed a copartnership, composed of G. M. Casey and W. A. Towers, under the firm name of Casey & Towers, which said firm was engaged in the cattle business.

June 26, 1905, the banking business of the said firm of Salmon & Salmon was placed in the hands of a receiver by the State court. On the same date proceedings in bankruptcy were instituted in the United States District Court at Kansas City, and later an adjudica-

tion of bankruptcy followed, and the plaintiff, Daniel F. Blake, was made trustee in bankruptcy of the estate of Salmon & Salmon, and all property, books and papers were turned over to him by the receiver of the State court.

The plaintiff in this action, as trustee as aforesaid, instituted suit against defendant to recover more than $40,000 as for money had and received. The petition is in thirty-four counts, but as all are practically identical, save as to the amount and dates, one count thereof will fairly state the petition. Count No. 30 reads:

"And for still other and further cause of action against defendant, plaintiff states that defendant is indebted to plaintiff, as trustee in bankruptcy of the estate of George Y. Salmon and Harvey W. Salmon, partners as Salmon & Salmon, in the sum of five thousand dollars, on account of money had and received from said banking firm of Salmon & Salmon, by defendant, on the 23d day of September, 1904, to the use of said banking firm of Salmon & Salmon, which sum of money defendant agreed to repay to Salmon & Salmon. Wherefore plaintiff prays judgment against defendant in the sum of $5,000, together with interest and costs."

Defendant after having unsuccessfully demurred to the petition, and after having unsuccessfully moved to make said petition more definite and certain, answered by way of general denial, with an admission of its corporate existence.

Trial was had before the court without the intervention of a jury, and the court, upon the conclusion of plaintiff's evidence, gave a declaration of law in the nature of a demurrer to the testimony, as to each count, except numbers 1, 2, 14, 16, 17, 18, 25, 26, 27, and 28, which were dismissed by plaintiff. Judgment was entered for the defendant and from this judgment after

an unsuccessful motion for new trial, the plaintiff appeals to this court.

The evidence in the record is short, and in substance shows the following:

On May 5, 1903, Casey & Towers executed and delivered to G. Y. Salmon the following note:

CLINTON, Mo., MAY 5th, 1903.

On Demand after date we promise to pay to the order of G. Y. Salmon Ten Thousand & no-100 dollars for value received, and payable at the banking house of Salmon & Salmon, Clinton, Mo., with interest from date at the rate of eight per cent per annum; and if interest be not paid annually to become as principal and bear the same rate of interest.

$10,000.00.        CASEY & TOWERS.
P. O. ————        G. M. CASEY.
Due. ————        W. A. TOWERS.

(Endorsed as follows):
    Demand, protest and notice waived.
                                        G. Y. SALMON.

On the same day, the following letter was addressed to G. W. Galbreath, the cashier of defendant, at St. Louis, Missouri:

Dear Sir:

We enclose herewith note $10,000.00 Casey & Towers, et al., endorsed by our G. Y. Salmon, with the request that you please favor us by cashing same and passing to our credit the amount thereof. As collateral thereto you can hold the $20,000.00 real estate note now in your possession. Note is made on demand for the reason that parties expect to pay same soon.

Yours very truly,
                                SALMON & SALMON.

The evidence shows that the note was endorsed by G. Y. Salmon, the payee, and the proceeds were credited to Salmon & Salmon on the books of defendant, and that upon receiving notice of this credit, Salmon & Salmon gave Casey & Towers credit on their books for a like amount.

On September 12, 1903, Casey & Towers made another note to G. Y. Salmon, as follows:

No. ——                              CLINTON, Mo., Sept. 12th, 1903.
    On demand after due we promise to pay on the order of G. Y. Salmon Twenty Thousand & no-100 Dollars, for value received, and payable at the banking house of Salmon & Salmon, Clinton, Mo., with interest from date at the rate of eight per cent per annum; and if interest be not paid annually to become as principal and bear the same rate of interest.
$20,000.00.                         CASEY & TOWERS.
P. O. ——                            G. M. CASEY.
Due. ——                             W. A. TOWERS.
    (Endorsed on back as follows):
        Demand, protest and notice waived.
                                    G. Y. SALMON

This note, so endorsed, was sent to Mr. Galbreath in St. Louis, Mo., with the following letter of date September 12, 1903:

Dear Sir:
    Enclosed herewith we send you demand note of Casey & Towers, G. M. Casey and W. A. Towers for $20,000.00, endorsed by our G. Y. Salmon, which we ask you to please handle and pass the amount thereof to our credit. Casey & Towers are shipping into their farm in this county a large lot of steers to sell to feeders, and in so doing are drawing on us for more than we can carry them for. And hence we ask that you please handle this note as a special favor to us. It will only run for a short time, as they are going to sell the steers right away, and out of the proceeds thereof take up this note. If you will kindly handle same for us, we hereby guarantee that during the time you carry it our credit balance with you shall not fall below $25,000.00, and that it shall be kept up to at least that amount as security for the payment of said note, and if it should fall below, or even fall to $25,000.00, you are at liberty to charge our account with this note, and this letter shall be your authority for so doing.
                            Yours very truly,
                            SALMON & SALMON.

The proceeds of this note were likewise placed to the credit of Salmon & Salmon in the Third National Bank of St. Louis, and Salmon & Salmon being so informed, placed a like credit to Casey & Towers in their bank.

These two notes were held by defendant until April 1, 1904. October 20, 1903, G. M. Casey died, thus dissolving the firm of Casey & Towers, which at that time was insolvent, and G. Y. Salmon was endorser on their paper, and the paper of G. M. Casey, to the extent of $150,000. On April 1, 1904, a representative of defendant visited Clinton and procured from Casey and G. Y. Salmon, the following notes:

10,000.00.                              CLINTON, Mo., April 1st, 1904.
    On demand after date we promise to pay to the Third National Bank of St. Louis, or order, at the banking house of said bank, at St. Louis, Mo., Ten Thousand Dollars, for value received, with interest at the rate of six (6) per cent per annum from date.
                                        SALMON & SALMON.

20,000.00.                              CLINTON, Mo., April 1st, 1904.
    On demand after date we promise to pay to Third National Bank of St. Louis, or order, at the banking house of said bank, at St. Louis, Mo., Twenty Thousand Dollars, for value received, with interest at the rate of six (6) per cent per annum from date.
                                        SALMON & SALMON.

At the date of the trial, each of said notes had endorsed across the face thereof: "Paid Jan. 14, 1905. Third National Bank, St. Louis, Mo."

With each of these notes the representative of defendant took a collateral security agreement signed by Salmon & Salmon, by which the two Casey & Towers notes were put up by Salmon & Salmon as a pledge or security for the two notes last above set out. These two agreements are marked paid on the same date and in the same manner as the two notes aforesaid.

Under the evidence G. Y. Salmon signed the name Salmon & Salmon to these two notes and those two agreements, and under the evidence Casey & Towers, G. Y. Salmon and Salmon & Salmon were in fact insolvent, although the insolvency of G. Y. Salmon and Salmon & Salmon was not disclosed to the defendant or its representatives. The only consideration for the last two notes signed by Salmon & Salmon was the two

notes signed by Casey & Towers, which notes were first herein fully set out. The evidence further discloses the fact that G. Y. Salmon, being endorser on the notes, had to take them up, or the bank of Salmon & Salmon would have to close.

The record further discloses that the first of each month the interest on the Casey & Towers notes would be charged to the account of Salmon & Salmon by the defendant bank, and up to the failure of Casey & Towers the bank of Salmon & Salmon would collect the interest from said firm.

On the back of these notes signed Salmon & Salmon were endorsements of payments and credits of principal and interest at different and sundry dates, as paid by Salmon & Salmon, and the different counts of the petition are based upon these several payments. These payments were made by Salmon & Salmon and the amounts thereof taken from the assets of Salmon & Salmon. The evidence discloses that Thomas M. Casey, as manager of Salmon & Salmon, had the full power to manage the business and sign the name of Salmon & Salmon. All the dealings as to these notes were between Salmon & Salmon and the defendant. Casey & Towers did not act directly with the defendant.

There is some testimony from Major H. W. Salmon that Salmon & Salmon, or Thomas M. Casey, held some $150,000 life insurance of G. M. Casey, but as to how it was held and what was done with it does not clearly appear. This testimony of Major Salmon was what he got from Mr. Thomas M. Casey and he (Salmon) understood that out of the insurance he was to be reimbursed for an individual note for $70,000 held by him against G. M. Casey.

The record further discloses that Major H. W. Salmon had no knowledge about any of these note transactions; that he was never consulted as to them, nor informed about them; that he never consented to the

taking of the firm's (Salmon & Salmon's) money to discharge the obligation of G. Y. Salmon.

Such are the facts disclosed by the record.

I.   That one partner, without the knowledge and consent of the other partner, cannot use the partnership property or assets to discharge his own personal obligation, is well settled law.   And that, if he does so use the property and assets of the copartnership, then the party receiving such property whether money or other property, in the payment of the individual obligation of one of the copartners, such party receiving the same is liable to the copartnership, is also well-settled law.   [Flanagan v. Alexander, 50 Mo. 50; Ackley v. Stachlin, 56 Mo. 558; Price v. Hunt, 59 Mo. 1. c. 263; Phelps v. McNeely, 66 Mo. 554; Forney v. Adams, 74 Mo. 138.]

As well said by the learned editor of the American State Reports, Vol. 7, p. 378, in a note to the case of Davies v. Atkinson: "The general rule then, as deduced from the above propositions—and this rule is settled beyond controversy—is, that a partner may not use the firm assets, or make a valid transfer of its property, in payment of his private or individual debts, or pledge the same for that purpose."

Nor may he settle a private debt with the firm's note.   [Howell v. Sewing Machine Co., 12 Neb. 179; Parsons on Partnership, sec. 121; Lanier v. McCabe, 2 Fla. 32.]

And many of the cases go to the extent that knowledge upon the part of the creditor receiving partnership property from one of the copartners that the property so received on the individual debt was partnership property is not required.   In other words, that the transfer passed no title, and the party receiving the firm's property from one partner on an individual debt, was liable to the firm, whether he knew

at the time he received it that it was the firm's property or not.

In the early case of Rogers v. Batchelor, 12 Peters l. c. 230, Mr. Justice STORY said: "In the case of a partner paying his own separate debt out of the partnership funds, it is manifest that it is a violation of his duty and of the right of his partners, unless they have assented to it. The act is an illegal conversion of the funds; and the separate creditor can have no better title to the funds than the partner himself had. Does it make any difference that the separate creditor had no knowledge at the time, that there was a misappropriation of the partnership funds? We think not. If he had such knowledge, undoubtedly he would be guilty of gross fraud; not only in morals, but in law. That was expressly decided in Sheriff v. Wilks, 1 East 48; and indeed, seems too plain upon principle to admit of any serious doubt. But we do not think that such knowledge is an essential ingredient in such a case. The true question is, whether the title to the property has passed from the partnership to the separate creditor. If it has not, then the partnership may reassert their claim to it in the hands of such creditor."

After a review of the early cases, he concludes thus: "But we think that the true principle to be extracted from the authorities is, that one partner can not apply the partnership fund or securities to the discharge of his own private debt without their consent; and that without their consent their title to the property is not divested in favor of such separate creditor, whether he knew it to be a partnership property or not. In short, his right depends, not upon his knowledge that it was partnership property, but upon the fact, whether the other partners had assented to such disposition of it or not."

Much of the language above quoted was quoted and approved by this court in the case of Ackley v.

219 Sup.—42

Staehlin, 56 Mo. 558.   Again, in the case of Phelps v. McNeely, 66 Mo. l. c. 558, where it is said:

"It was held in the case of Flanagan v. Alexander, 50 Mo. 50, that one partner has no power or authority whatever, without the consent of his copartners, to appropriate the assets of the partnership to the payment of his individual indebtedness.   While a partner can dispose of the property by a bona-fide sale he cannot appropriate it without the consent of his copartners, to the payment of his individual debts, either with or without knowledge of the creditor that such property was partnership property.   [Ackley v. Staehlin, 56 Mo. 561.]"

It is true this case is in terms overruled in the case of Goddard-Peck Grocery Co. v. McCune, 122 Mo. l. c. 431, but only on the question as to the right of copartners prior to the dissolution of the partnership to bona-fide appropriate by consent of all the partners, the firm property to the payment of individual debts.   We think there was a misunderstanding of the real point decided in Phelps v. McNeely, in the overruling thereof in the 122 Mo., supra. We do not understand the Phelps case to hold that with the consent of all the partners, partnership property cannot be applied to individual debts of copartners, but if it does so hold it was rightly overruled.   Nor did Judge BLACK understand the Phelps case as it seems to have been understood in the McCune case, supra, for in Sexton v. Anderson, 95 Mo. l. c. 381, he says: "With us each partner is liable for all the partnership debts. The partners may, so long as the firm exists, do with their property as they see fit.   The firm creditors have no lien on the partnership property for the payment of their debts, while the firm continues to exist.   Partners have the right to have the partnership property applied to partnership purposes, but this is a right or lien which they may waive. Hence the great majority of adjudicated cases are to this effect, that all the partners may, by their joint act, dis-

pose of partnership property in liquidation and payment of a debt owing by an individual member of the firm. The qualification is that the transaction must be in good faith and not for fraudulent purposes. Rogers v. Batchelor, 12 Pet. 221, 232; City v. Willey, 35 Iowa 323; Case v. Beauregard, 99 U. S. 124; Schmidlapp v. Currie, 55 Miss. 597, 30 Am. Rep. 530; Flanagan v. Alexander, 50 Mo. 50; Ackley v. Staehlin, 56 Mo. 558; Price v. Hunt, 59 Mo. 258; and Forney v. Adams, 74 Mo. 138, are all in accord with what has been said. These cases recognize the right of one partner to apply partnership property, with the consent of the other partners, to the payment of his debt. Nor is the authority of these cases shaken by the subsequent case of Phelps v. McNeely, 66 Mo. 554, for they are in terms approved.''

But however this may be, the quotation we use from the Phelps case is upon a point not questioned in the McCune case, i. e., that where there has been no consent given by the other partners, one partner can not use firm assets in the discharge of individual debts, and it is immaterial whether the creditor knew or did not know that it was firm property he was receiving. So, too, in Price v. Hunt, 59 Mo. l. c. 263, it was said: ''It is settled that one member of a firm can not appropriate the partnership effects, without the consent of his copartners, to the payment of his individual debts, either with or without the knowledge of the creditors that the property belonged to the firm.''

To a like effect is the language of SMITH, P. J., in Ewart v. Tootle & Co., 50 Mo App. l. c. 327, wherein he said: ''While one partner can dispose of the property by a bona-fide sale, he cannot appropriate it without the consent of his copartner to the payment of his individual debts, either with or without the knowledge of the creditor that such property is partnership property.''

So that this court has followed throughout the rule laid down by Mr. Justice STORY.

The reason of the rule is, that in the disposition of property a copartner is the agent of the copartnership, and whilst having full power to dispose of the firm property and assets in the course of the business of the firm, yet when a copartner undertakes to apply the assets of the firm to his individual debt, he is going beyond the scope of his authority as the agent of the firm, and his acts are void, and pass no title to the property, as against the firm or creditors of the firm, unless consent of the other copartners to such transaction is shown. So that in this case, if the obligation of the Third National Bank, on the Casey & Towers notes, was the obligation of G. Y. Salmon individually, then he as copartner and agent of the firm of Salmon & Salmon had no right to execute the notes in question, and had no right to take the assets and funds of the firm to pay said notes, without the assent of H. W. Salmon, and this the evidence shows he did not have.

Nor could Casey, as manager, go further than G. Y. Salmon. As manager he was but the agent of the firm and had full power to transact all business of the firm, but when he went beyond the scope of his authority and took firm assets to pay individual debts of one of the partners, without the knowledge or consent of the other, then his acts are not any more binding than if done by G. Y. Salmon himself. Both were agents of the firm. [Johnston v. Realty Co., 62 Mo. App. l. c. 160.]

The law seems to be well settled, but the real difficulty in this case is its application to the facts. This we undertake next.

II. We shall discuss the $20,000 note first. When Casey & Towers gave that note, it was to G. Y. Salmon, and not to the firm of Salmon & Salmon. When G. Y. Salmon placed his name on the back thereof as an en-

dorser, it was the act of G. Y. Salmon and not of Salmon & Salmon. Without further showing than the note itself, the liability was on the makers and the endorser G. Y. Salmon and not on Salmon & Salmon. When the note was sent to defendant it was with the letter of September 12, 1903, supra. This letter to our mind clearly indicates that the firm of Salmon & Salmon was not placing this note as their own. This letter clearly shows that Salmon & Salmon had not bought this note of G. Y. Salmon, for in effect it says that Casey & Towers wanted more money than they (Salmon & Salmon) could spare. If the firm had bought the note and it was their property, the regular course would have been an endorsement of the firm if they desired to rediscount. The letter says: "—and hence we ask that you please handle this note as a special favor to us," not that they wanted to rediscount a note which they had purchased. This letter clearly indicates that Salmon & Salmon did not have the spare cash to invest in this note; that they wanted to help Casey & Towers get their money from some other source. The very fact that they undertake by the letter to guarantee the note instead of placing the firm name on the back thereof as an endorser indicates that the firm did not own the note.

When the defendant got this note and letter, it must have known (1) that Casey & Towers, and not Salmon & Salmon, wanted $20,000; (2) that Salmon & Salmon had not purchased the note because the letter indicates that the firm did not have the spare cash; (3) that the firm wanted defendant to discount the note for Casey & Towers, so that they might have the money in their cattle business and suggested that such action would be taken as a special favor to Salmon & Salmon. The only thing in the entire letter is the statement to pass the proceeds to the account of Salmon & Salmon with defendant bank. This to our mind is not against our theory of the case. This was but one of the several

modern methods of transferring funds. The proceeds were so credited in St. Louis and when Salmon & Salmon were notified, they gave Casey & Towers credit for a like sum. This letter clearly indicated to defendant such would be done. Defendant could not read this letter without knowing that the money was ultimately to go to Casey & Towers, and so knowing, they would, as a reasonably prudent business house, have known that depositing the proceeds to the credit of Salmon & Salmon was simply the means of transferring the fund, and not otherwise. They could not read this letter and for a moment think that Salmon and Salmon were to get this money for their own use, but the letter to the contrary told them who was to get the money and how it was to be used and by whom and how the note was to be paid, i. e., by Casey & Towers out of the proceeds of cattle to be sold. That funds are frequently transferred in the manner directed by this letter is well known. As said in Bank v. Express Company, 93 U. S. 185, "We cannot close our eyes to the well-known course of business in the country." Defendant knew or ought to have known from the tenor of this letter that Salmon & Salmon would credit Casey & Towers with the proceeds when advised that they had received such credit. It is and was an ordinary method of transferring funds.

So that up to this point, i. e., the discounting of this note by defendant, we have Casey & Towers, as a firm, and G. M. Casey and W. A. Towers, individually, liable to defendant for $20,000 and the accruing interest. In addition G. Y. Salmon was individually liable to them as an indorser. Thos. M. Casey, as agent and manager, had no authority to make the guaranty he did make in the latter part of the letter, because it was beyond the scope of his authority to bind the firm to pay either the lability of Casey & Towers, or the individual liability of G. Y. Salmon, one of the copartners.

So the matter stood until April 1, 1904, when the Salmon & Salmon notes were given. In the meantime G. M. Casey had died and the firm of Casey & Towers was dissolved, and not only so, but was likewise insolvent, so the evidence runs. Then we have the unusual occurence of a city bank sending out a representative to one of its country correspondents to get a settlement. The settlement, so far as this note of $20,000 was concerned, was that G. Y. Salmon, who was liable as indorser to defendant, issued a new note in the name of Salmon & Salmon to defendant to discharge his own liability. This he did without consultation with his copartner and without his knowledge or consent. Salmon & Salmon was not bound by the act of Casey expressed in the latter part of the letter, nor was the firm bound by this new note, which was the sole act of one partner in an attempt to use the assets of the firm to liquidate a personal liability. Defendant can not complain, because it must have known on April 1st that it had but two sources to look to for the payment of the $20,000 note, i. e., the property of Casey & Towers, insolvent, and so known to be at the time, and G. Y. Salmon, the indorser. With its agent present, defendant takes the note signed Salmon & Salmon, by G. Y. Salmon, without the consent of H. W. Salmon. After receiving the note, they received interest thereon and payment thereof out of the assets of Salmon & Salmon, a firm in fact insolvent, but not known to be insolvent, unless the singular action of defendant in sending a man out for an adjustment might indicate its knowledge of the firm's condition. That the defendant got the sum of $20,000, and certain monthly interest payments from Salmon & Salmon is thoroughly shown. The conduct of defendant with the knowledge it had from the letter is such as to work a fraud upon the firm of Salmon & Salmon and its creditors, represented in this case by the trustee, plaintiff herein. We conclude that defendant is liable for the amounts, both principal

and interest, received upon this note, unless relieved therefrom by certain other contentions by it urged, which we next discuss.

III. Defendant urges several reasons why it should not be held liable.

(a). It first says that the notes, both the original and subsequent ones, were treated by Salmon & Salmon as representing their liabilities. What we have said about the letter sent with the $20,000 note, and the note taken in lieu thereof, in paragraph two disposes of this contention.

(b). Next defendant says: "Even though the notes first discounted did not carry with them a partnership obligation, yet if, when their payment was demanded of the partnership by the defendant, the partnership, for purposes of its own, admitted liability thereon, there was a valuable consideration for the giving of the new notes, which the partnership ultimately paid."

This contention is not borne out by the facts. The firm never admitted liability thereon. Under the evidence all that was done can be thus summed up: G. Y. Salmon recognized his liability as endorser on the Casey & Towers note; that as a member of the firm of Salmon & Salmon he could not afford to be sued on his contract as an endorser; that without the knowledge or consent of his copartner, he undertook to cancel his liability by giving a firm note; that after so giving it, either he or Casey paid it out of the firm money. Cases cited by defendant are not in point and do not bear them out in this connection.

(c). It then contends that there was ratification by the firm. The evidence does not so show. Maj. H. W. Salmon said he never heard of the notes until some three or four days before the trial. G. Y. Salmon, alone, could not ratify an unauthorized act, any more than he could divert the firm assets to pay his own

debt. It would be a peculiar state of the law to say that G. Y. Salmon alone could not legally bind the firm by giving the firm's note to pay his individual obligation, which is the reading of the law, and yet say that after he had done so, he, alone, could so ratify the unlawful act as to make it binding. Consent and knowledge upon the part of the other copartners must be shown just as much in the ratification as in the original note. Without the consent of H. W. Salmon, his copartner, G. Y. Salmon could not bind the firm by the notes given, nor without that consent can he bind the firm by attempted ratification. Thomas M. Casey's powers were no greater than those of G. Y. Salmon. They were both mere agents of the firm—one, by reason of being a partner, and the other, by reason of being a manager. One had no greater authority than the other.

(d). Next, it is urged: "The moneys were paid voluntarily by Salmon & Salmon with a full knowledge of the facts, and can not be recovered by their trustee."

This statement of the law is well enough if it accorded with the facts. The firm of Salmon & Salmon never voluntarily paid this money. It was paid by the agents of the firm in fraud of the firm's rights, and without knowledge of one member of the firm. Had G. Y. Salmon or T. M. Casey on April 1, 1904, taken $20,000 in cash out of the vaults of the bank without the consent of H. W. Salmon and paid G. Y. Salmon's personal obligation as an indorser on this note to defendant, would it be said for a moment that the firm of Salmon & Salmon could not have recovered from defendant? We think not. Yet such a payment stands in no better light than the partial payments, made out of the firm assets, on this unauthorized note, and without the knowledge or consent of H. W. Salmon. When defendant took the note from G. Y. Salmon, signed "Salmon & Salmon," to discharge the individual liability of G. Y. Salmon, it was a fraud upon the firm, to which de-

fendant was a party, and all subsequent transactions were tainted with this fraud.

(e). Lastly, it is urged: "This is an action for money had and received, and the plaintiff has made no showing to entitle him to recover moneys which in equity and good conscience the defendant should return."

If we have correctly analyzed the situation at the time the Salmon & Salmon note was given on April 1, 1904, and if the conduct of defendant in taking said note without the consent of Major Salmon thereto, operated as a fraud upon the firm, then.there is complete room for equity and good conscience. Defendant knew that it was getting the firm's obligation for the debt of an individual debt, and when it got the money it knew it came from the firm assets.

We are clearly of the opinion that as to this note and the payments thereon, both principal and interest, the court *nisi* was in error.

IV. As to the first $10,000 note given by Casey & Towers, the letter sent with it is not so strong as the letter accompanying the $20,000 note just discussed. Whilst this is true, we are of the opinion that the fact, therein indicated, to the effect that G. Y. Salmon alone was the indorser and not Salmon & Salmon, was sufficient to put defendant upon inquiry as to the character of this note. This coupled with what was done 'on April 1, when defendant's agent saw and knew that H. W. Salmon was not present, was sufficient to take the counts involving the sums paid on this note to the jury or to the court sitting as a jury.

The judgment should be reversed and the cause remanded to be further proceeded with in accordance with the views herein expressed. It is so ordered. *Valliant, C. J., Fox* and *Woodson, JJ.,* concur. *Burgess* and *Lamm, JJ.,* dissent; *Gantt, J.,* being a creditor of the Salmon estate, does not sit.